UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

David Silber,

       Plaintiff,

       v.                            Civil Action No. 1:09-CV-73

Andrew Pallito, Robert Hofmann,
Robert Kupec, Raymond Flum,
David Bovat, Ellen McWard,
Anita Carbonell, Dominic Damato,
James Kamel, Mark Potanis,

       Defendants.

## REPORT AND RECOMMENDATION
(Doc. 48)

*Pro se* plaintiff David Silber brings this action claiming that while he was a federal pre-trial detainee, certain conditions of his confinement violated his due process and Eighth Amendment rights.   Defendants now move for summary judgment, arguing that they are entitled to qualified immunity with respect to Silber's initial confinement, and that his subsequent placements in restricted confinement were justified by Silber's own conduct.   For the reasons set forth below, I recommend that the Motion for Summary Judgment (Doc. 48) be GRANTED, and that this case be DISMISSED.

## Factual Background

The following facts are undisputed unless otherwise stated.   This action arises out of conditions of Silber's detention while he was awaiting trial on federal drug charges.   As a pre-trial detainee, Silber was first housed at the Marble Valley Regional Correctional

Facility ("MVRCF"), and then at the Southern State Correctional Facility ("SSCF"). Both facilities are in the State of Vermont, and are operated by the Vermont Department of Corrections ("DOC").

Silber's first claims pertain to his time spent in a level of confinement known as "close custody."   At the time of Silber's initial incarceration following his arraignment, the DOC's classification system required that, as a federal pre-trial detainee, he be placed in close custody.   Close custody is a more restrictive level of confinement than general population, but is not as restrictive as administrative or disciplinary segregation.   (Doc. 21-1, Kupec Aff. ¶ 3.)   In his verified Amended Complaint, Silber describes close custody as "a 22-hour lock-down" environment, with no access to educational services, rehabilitative services, or religious and self-help groups, and limited access to the library and commissary.   (Doc. 58 at 5.)   He alleges that unlike general population, close custody inmates are not allowed Walkman radios or televisions, and are restricted to "video-visits" with friends and family.   (*Id.*)

The DOC explains that the decision to house federal detainees in close custody, at least upon their initial arrival at DOC facilities, arose out of an event in the late 1990s. (Doc. 21-2, Murphy Aff. ¶¶ 6-8.)   That event involved two federal detainees, each of whom had considerable escape histories.   The DOC was unaware of those histories, the detainees tried to escape, and a correctional officer was seriously injured.   The DOC contends that "had [the detainees] been held in close custody, the injuries would likely have been prevented."   (Doc. 48 at 2.)

The DOC policy for federal detainees, which was altered subsequent to Silber's

2

detention, required that they be held in close custody for approximately 30-60 days, at which time they would become eligible for an "override" to general population.   Silber received such an override, but subsequently violated a disciplinary rule and was returned to close custody.   He then received a second override, again violated a disciplinary rule, and was again returned to close custody.   He received a third override on June 10, 2009. (Doc. 21-1, Kupec. Aff ¶ 14.)   Notwithstanding the override process, Silber contends that close custody had no formal review process and no guidelines, "making the implementation of Close-Custody completely arbitrary, left to the whims of the facility staff."   (Doc. 58 at 5.)   He submits that his placement in close custody violated both his substantive and procedural due process rights.

Silber's second set of claims pertains to time he spent in a dry cell.   In December 2008, he was confined to a dry cell after a correctional officer observed another inmate passing him an unidentified object.   According to the incident report, when two correctional officers entered Silber's cell to conduct a search, one of them saw him put his hand down the back of his underwear as if trying to push the object up his rectum.   The officers each seized one arm, and Silber resisted.   After he was handcuffed, Silber reportedly continued to try to push something into his rectal cavity.   Officers could see an object in his rectum, but Silber denied having put anything there.   (Doc. 48-3, Rutherford Aff. ¶ 12-16.)   At 12:38 p.m. on December 12, 2008, Silber was placed on dry cell status. Shortly after the officers left the cell, Silber was observed via video camera removing an object from his anus and putting it in his mouth.   (*Id.* at ¶ 17.)

The affidavit of Joshua Rutherford, Assistant Superintendent of Security and

Operations at SSCF, explains that dry cells are used when an inmate is suspected of concealing contraband in his body.   The purpose of placing in inmate in a dry cell is to retrieve the object "before it leads to harm, either to the inmate himself or others."   (*Id.* at ¶ 6.)   Inmates are provided running water for drinking, but the toilet is disabled so that the inmate cannot flush the object away.   During the winter, cells are generally maintained at a temperature of between 68 and 72 degrees Fahrenheit, and inmates are allowed a blanket and mattress between 10 p.m. and 6 a.m.   Inmates can only wear underwear while in the dry cell, and are provided a supervised shower once every 72 hours.   (*Id.* at ¶¶ 4-10.) Silber was placed on fifteen minute checks to review his condition, and his dry cell status was reviewed every eight hours to determine whether the placement was still appropriate. (Doc. 48-1 ¶ 23; Doc. 48-3 ¶ 11.)

Silber's Amended Complaint does not directly contradict the DOC's description of dry cell status, although he does contend that he was denied a shower.   Silber confirms that he was restricted to a pair of boxer shorts, and that he was provided a mattress between 10 p.m. and 6 a.m.   He also describes the cell as having been "freezing cold" as the result of an open window, and complains that he was denied personal hygiene items (including a toothbrush, toothpaste, soap, shampoo, and toilet paper), pen, paper and grievance forms. (Doc. 58 at 6-7.)

According to Defendants, inmates on dry cell status are told that their confinement will end when they relinquish the contraband.   (Doc. 48-1 ¶ 21.)   While dry cell status does not usually extend beyond 3 days, Silber's time in the dry cell was longer than the usual, in large part because the object was never recovered.   After four days and

approximately four and a half hours,[1] the reviewing officer determined that recovery of the contraband could not be reasonably expected, and that continued detention served no penological purpose.   (*Id.* at ¶ 20.)   Silber alleges that his placement in a dry cell constituted "pure retaliatory harassment and deliberate indifference to the Plaintiff's basic human needs."   (Doc. 58 at 7.)

Defendants now move for summary judgment on all claims, arguing that they are entitled to official capacity immunity under the Eleventh Amendment; that Silber has failed to allege any physical injury that would entitle him to compensatory damages; that they are entitled to qualified immunity for Silber's initial placement in close custody; and that Silber's placement in a dry cell was justified and did not violate his constitutional rights.   They also assert that Silber's retaliation claim is without merit.

Defendants filed their motion on June 1, 2010.   The Court subsequently granted Silber an extension of time to file his opposition, extending the deadline to September 15, 2010.   On October 29, 1010, Silber again moved for additional time, and the Court extended his filing deadline to January 3, 2011.   A further extension was granted through February 1, 2011.   That deadline has now passed, and no opposition has been filed.

### Discussion

## I.   Summary Judgment Standard

Summary judgment is warranted when the pleadings, depositions, answers to

---

[1]   The Amended Complaint alleges that Silber was in dry cell confinement for five days.   (Doc. 58 at 6.)   Defendants' statement of undisputed facts states that he was placed on dry cell status on December 12, 2008 at approximately 12:36 p.m., and released at approximately 5:05 p.m. on December 16, 2008. (Doc. 48-3 at 3.)   For purposes of the analysis below, the difference is not material.

interrogatories, admissions, and affidavits reveal no genuine issue as to any material fact. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   All facts, inferences, and ambiguities must be viewed in a light most favorable to the non-moving party.   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Initially, the burden is on the moving party to demonstrate the absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   After the moving party has satisfied its burden, the non-moving party must assert specific facts demonstrating there is a genuine issue to be decided at trial.   Fed. R. Civ. P. 56(e)(2); *Liberty Lobby, Inc.*, 477 U.S. at 250.   The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."   *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.   There must be sufficient evidence upon which a reasonable fact finder could return a verdict for the non-moving party.   *Anderson*, 477 U.S. at 248-49; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

When, as here, a party seeks dismissal or summary judgment against a *pro se* litigant, a court must afford the non-movant special solicitude.   *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006); *see also Sealed Plaintiff v. Sealed Defendant # 1*, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se* . . . a court is obliged to construe his pleadings liberally.'") (citations omitted)).   Also, when a motion for summary judgment is unopposed, the court cannot simply grant the motion.   "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no

6

opposing evidentiary matter is presented." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citations and internal quotation marks omitted). "Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [statement of material facts.]   It must be satisfied that the citation to evidence in the record supports the assertion." *Id.*

Although Silber has not filed a timely opposition, his Amended Complaint is signed "under penalty of perjury."   (Doc. 58 at 9.)   Consequently, as part of the summary judgment record, and in keeping with the general principle that *pro se* litigants should be granted considerable latitude, the Court will consider his assertions set forth in the Amended Complaint.   *See Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir.2004) ("[A] verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment.").

## II.   **Official Capacity Immunity**

Defendants first argue that they are immune from suit in their official capacities, insofar as Silber is seeking damages under 42 U.S.C. § 1983.   The Eleventh Amendment prohibits suits for damages brought in federal court against unconsenting states or state officials sued in their official capacities.   *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974).   As the Supreme Court has explained, "an official-capacity suit against a state officer 'is not a suit against the official but rather is a suit against the official's office.   As such it is no different from a suit against the State itself.'"   *Hafer v. Melo*, 502 U.S. 21, 26 (1991) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)).

A state may waive its Eleventh Amendment immunity so long as the waiver is unequivocally expressed.   *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984).   Additionally, Congress may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment.   *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976). Relevant to this case, Congress has not abrogated Vermont's sovereign immunity from a § 1983 suit in federal court.   *See Will*, 491 U.S. at 67.   Moreover, the State of Vermont has expressly preserved its sovereign immunity under the Eleventh Amendment.   *See, e.g.*, 12 V.S.A. § 5601(g).   Silber's claims for damages against Defendants in their official capacities are therefore barred by the Eleventh Amendment, and should be DISMISSED.

## III.   Available Remedies

Defendants next contend that if the Court finds a constitutional violation, Silber is limited to nominal damages.   Under the Prison Litigation Reform Act ("PLRA"), an inmate who seeks to recover compensatory damages for a mental or emotional injury must first establish that he has suffered a "physical injury."   *See* 42 U.S.C. § 1997e(e); *Thompson v. Carter*, 284 F.3d 411, 417 (2d Cir. 2002).   However, a plaintiff is not required to show physical injury in order to recover nominal or punitive damages, or to obtain declaratory relief.   *Thompson*, 284 F.3d at 416.

Silber's Amended Complaint does not allege any physical injuries aside from discomfort and emotional distress resulting from his time spent in close custody and dry cell confinement.   Accordingly, he is barred by the PLRA from receiving compensatory damages.   *See* 42 U.S.C. § 1997e(e).   The Amended Complaint does not ask for declaratory relief, and Silber's request for injunctive relief was mooted by the DOC's

change in policy with respect to its confinement of federal detainees.   (Doc. 31 at 6); (Doc. 33.)

As to the question of punitive damages, such damages may be awarded under § 1983 when "'the defendant's conduct is shown to be motivated by an evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'"   *Disorbo v. Hoy*, 343 F.3d 172, 186 (2d Cir. 2003) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).   Silber is seeking punitive damages solely from current DOC Commissioner Pallito, and former Commissioner Hofmann.   His claim is that the Commissioners failed to "control the reckless indifference of employees under [their] direct supervision."   (Doc. 58 at 7.)

The record at summary judgment does not support an award of punitive damages. Defendants have established that close custody confinement of federal pretrial detainees was based upon past experience, and there is no indication that the policy was continued out of either an evil motive or callous indifference to those detainees' rights.   As to Silber's dry cell confinement, he has not specifically refuted the Defendants' facts regarding his efforts to conceal an object in his body, and offers only conclusory allegations of retaliatory conduct.   Such allegations are insufficient to show a genuine issue for trial.   *See Anderson*, 477 U.S. at 256-57 (conclusory statements do not create genuine issue for trial); *Davis v. New York*, 316 F.3d 93, 100 (2d Cir. 2002) (same). Accordingly, Defendants should be GRANTED summary judgment to the extent that Silber is asking for any relief beyond nominal damages.

**IV.   Qualified Immunity**

Defendants further argue that they are entitled to qualified immunity for both

Silber's initial placement in close custody and his subsequent confinement in a dry cell.

Specifically, they argue that Silber did not have a clearly established right to have his status

as a federal detainee disregarded, or to avoid dry cell confinement where an officer

reasonably believed he was concealing contraband in his body.   (Doc. 48 at 7.)

"Government actors have qualified immunity to § 1983 claims 'insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'"   *Bolmer v. Oliveira*, 594 F.3d 134, 141 (2d Cir.

2010) (quoting *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 432 (2d

Cir. 2009)).   Thus, "[a] qualified immunity defense is established if (a) the defendant's

action did not violate clearly established law, or (b) it was objectively reasonable for the

defendant to believe that his action did not violate such law."   *Salim v. Proulx*, 93 F.3d 86,

89 (2d Cir. 1996).   As the Second Circuit has explained, "[e]ven where the law is 'clearly

established' and the scope of an official's permissible conduct is 'clearly defined,' the

qualified immunity defense also protects an official if it was 'objectively reasonable' for

him at the time of the challenged action to believe his acts were lawful.'"   *Taravella v.*

*Town of Wolcott*, 599 F.3d 129, 134 (2d Cir. 2010); *see also Provost v. City of Newburgh*,

262 F.3d 146, 160 (2d Cir. 2001) (qualified immunity standard is "forgiving" and

"'protects all but the plainly incompetent or those who knowingly violate the law'")

(quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

To determine whether a right is clearly established, a court must determine "(1)

10

whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question [;] and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). A court may determine whether a right is clearly established before it determines the question of whether a constitutional violation occurred. *See Pearson v. Callahan*, 129 S. Ct. 808, 813 (2009); *Amore v. Novarro*, 624 F.3d 522, 530 n.10 (2d Cir. 2010).

## A.    Close Custody

Silber alleges that his close custody confinement violated both his substantive and procedural due process rights. The Court will first consider his procedural due process challenge, which claims that there was no DOC policy providing for review of close custody status, and that implementation was thus "left to the whims of the facility staff." (Doc. 58 at 5.) Because Silber was a pre-trial detainee, his claim is reviewed under the Fourteenth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (in contrast to a sentenced prisoner, whose conditions of confinement are analyzed under the Cruel and Unusual Punishment Clause of the Eighth Amendment, "the proper inquiry [for a pretrial detainee] is whether conditions [of confinement] amount to punishment of the detainee" under the Due Process Clause of the Fourteenth Amendment).

In order to establish a procedural due process claim under § 1983, a plaintiff must demonstrate that he possessed a protected liberty interest and was deprived of it without

due process.   *See, e.g., McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir.

2001).   "Protected liberty interests 'may arise from two sources - the Due Process Clause

itself and the laws of the States.'"   *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454,

460 (1989) (quoting *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)).   As to the latter, Silber

does not allege a state law or regulation that created a liberty interest with respect the

placement of federal detainees in close custody.   In fact, he alleges that there was no

"formal review process," and "a complete absence of a governing directive or DOC

policy."   (Doc. 58 at 5.)

Under the Due Process Clause, "[a]s a general rule, conditions of confinement

imposed in pretrial detention do not give rise to a violation of a prisoner's due process

rights unless they are punitive."   *Palacio v. Pagan*, 345 F. App'x 668, 669 (2d Cir. 2009)

(citing *Bell*, 441 U.S. at 535).   "Not every disability imposed during pretrial detention

amounts to 'punishment' in the constitutional sense . . . ."   *Bell*, 441 U.S. at 537.   To the

extent that a detention is non-punitive, it is generally accepted "that 'the transfer of an

inmate to less amenable and more restrictive quarters for nonpunitive reasons' is not a right

protected by the due process clause itself."   *Covino v. Vermont Dep't of Corr.*, 933 F.2d

128, 129 (2d Cir. 1991) (citing *Hewitt*, 459 U.S. at 468).

Non-punitive classification decisions are often referred to as "administrative."

*See, e.g., Hewitt*, 459 U.S. at 468; *Sher v. Coughlin*, 739 F.2d 77, 81 (2d Cir. 1984).   An

example of administrative classification would be the separation of a "potentially

disruptive groups of inmates."   *Walker v. Shaw*, 2010 WL 2541711, at *4 (S.D.N.Y. June

23, 2010)).   Such classification decisions are within the "'full discretion'" of prison

12

officials, "and prisoners have 'no legitimate statutory or constitutional entitlement sufficient to invoke due process' in connection with such conditions [of confinement]." *Walker*, 2010 WL 2541711, at *4 (quoting *Pugliese v. Nelson*, 617 F.2d 916, 923 (2d Cir. 1980)).

In *Shine v. Hofmann*, 2009 WL 2179969 (D. Vt. July 22, 2009), this Court reviewed the administrative confinement of a federal pre-trial detainee in close custody. The Court found that state law did not clearly provide a liberty interest, and that under federal law, there was no clear right to procedural due process when the segregation was based upon legitimate, non-penological reasons. *Shine*, 2009 WL 2179969, at *7. Consequently, the Court concluded that the "legal underpinnings of a protected liberty interest have not been clearly established," and granted the defendants qualified immunity. *Id.* The Court reaches the same conclusion here.

Silber was placed in close confinement based upon an administrative determination by DOC staff pertaining to the potential dangers of federal detainees. The confinement was reviewed within thirty to sixty days. The parties have not informed the Court of a governing state law provision, and federal due process does not create a liberty interest for administrative confinement. *See Walker*, 2010 WL 2541711, at *4. It is therefore questionable whether the DOC violated Silber's right to procedural due process. Even assuming a violation, however, and as this Court concluded in *Shine*, the legal underpinnings of a liberty interest arising out of a limited period of administrative segregation are not clearly established, and Defendants are entitled to qualified immunity with respect to Silber's procedural due process claim.

13

When the Court turns to the question of substantive due process, it must again ask whether there was a liberty interest, and as part of that analysis, whether Silber's confinement was punitive.   "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.'"   *Bell*, 441 U.S. at 539.   The Second Circuit has also stated that "we are mindful that the intervention of courts in a prison's classification of prisoners for monitoring and control purposes might in some cases improperly involve courts in the day-to-day operations of prison systems, 'which are better left to the expertise of prison administration authorities.'"   *Palacio*, 345 F. App'x at 669 (quoting *Pugliese*, 617 F.2d at 925).   It has been held in this circuit that "unless there is evidence of an expressed intent to punish on the part of correctional officials, a particular condition or restriction that is reasonably related to a legitimate governmental objective, such as maintaining institutional order and security, will not be considered punishment."   *Muhmmaud v. Murphy*, 632 F. Supp. 2d 171, 176 (D. Conn. 2009) (citing *Bell*, 441 U.S. at 538-40).

In this case, the undisputed facts show that Silber was not placed in close custody, at least initially, for punitive purposes.   Defendants have submitted, and Silber does not contest, that they had a legitimate governmental purpose for placing federal detainees in close custody upon their arrival in DOC custody.   In sum, Silber's initial placement in close custody was not intended as a form of punishment, and was instead based upon an administrative decision regarding federal detainees generally.   Given the punishment-focused, post-*Bell v. Wolfish* approach to substantive due process claims, this Court should find that the law did not clearly establish a constitutional violation of Silber's

14

rights, and that Defendants are entitled to qualified immunity on this claim.

### B.    Dry Cell Confinement

Similarly, Silber is not entitled to any relief for his dry cell confinement.   Again,
under the Fourteenth Amendment, the "proper inquiry is whether particular restrictions and
conditions or restrictions accompanying pretrial detention amount[ed] to punishment in the
constitutional sense of that word" or whether they were merely "an incident of some other
legitimate governmental purpose."   *Bell*, 441 U.S. at 538.[2]   The undisputed facts with
respect to Silber's dry cell confinement are that correctional officers saw him try to conceal
an object inside his body, and that their suspicions were bolstered by his subsequent
conduct.   In response, Silber merely notes that the contraband was never found.

There is no indication in the record that Silber's dry cell confinement was unrelated
to a "legitimate governmental objective."   *Bell*, 441 U.S. at 538-39.   As Defendants
explain, the purpose of dry cell confinement is to protect the inmate and others in the prison
community by recovering the suspected contraband.   (Doc. 48-3, Rutherford Aff. ¶ 6.)
Nor does the record support a finding of punitive conduct.   Silber's confinement was only
slightly longer than the DOC's common practice, in large part because the contraband was
not recovered.   Bedding and other provisions allowed inside the cell also appear to have

---

[2]   Silber's claim that he was denied "pen, paper or Grievance forms" while in the dry cell could be construed as an access to courts claim.   (Doc. 58 at 7.)   However, to the extent that Silber was unable to file a grievance, Defendants have not sought dismissal on the basis of a failure to exhaust administrative remedies.   Furthermore, it has been noted that "[s]ince nothing is allowed in the dry cell for security reasons in furtherance of the contraband detecting objective, the contemporaneous condition of having no ability to petition the judiciary or internal prison grievance system is but another temporary condition which is not actionable under the Constitution."   *Stewart v. Wright*, 1996 WL 665978, at *2 (7th Cir. Nov. 14, 1996) (unpublished) (citing *Johnson v. Pelker*, 891 F.2d 136, 138-39 (7th Cir. 1989)).

been consistent with DOC policies.   Although Silber alleges that he was not provided a shower after 72 hours, his confinement did not extend much beyond this time period, and there are no facts to support a finding that the deprivation was punitive.[3]

Ultimately, given that Silber's dry cell confinement was premised on valid "security concerns" and was thus "reasonably related to legitimate goals of detention officials," this Court should find that "no basis exists to draw an inference of intent to punish . . . ." *Byrd v. Maricopa County Sheriff's Dep't*, 2011 WL 13920, at *4 (9th Cir. Jan. 5, 2011); *see also Bell*, 441 U.S. at 540 ("[T]he Government must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees."). As a pretrial detainee, Silber made efforts to conceal contraband.   Correctional officials followed standard procedures in an effort to obtain that contraband.   There are no facts to suggest that Silber's treatment was intended as punitive, and no basis to infer such intent.

Silber also claims that Defendants were "deliberate[ly] indifferent to [his] basic human needs."   (Doc. 58 at 7.)   The Second Circuit has held that "[c]laims for deliberate indifference . . . should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."   *Caiozzo v. Koreman*, 581 F.3d

---

[3]   The Court notes that Silber has not alleged any procedural due process claim with respect to his dry cell confinement.

63, 72 (2d Cir. 2009).[4]   Under the Eighth Amendment standard, prison officials must

"provide humane conditions of confinement" and "ensure that inmates receive adequate

food, clothing, shelter, medical care, and take reasonable measures to guarantee the safety

of inmates."   *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).   To establish an Eighth

Amendment claim based on inappropriate living conditions, a plaintiff must establish that

(1) he was incarcerated under conditions which posed a substantial risk of serious harm,

and (2) prison officials acted with deliberate indifference to his health or safety.   *Id.* at

834.

 "The deliberate indifference standard embodies both an objective and a subjective

prong."   *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).   Under the objective

standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a

constitutional violation.   *Hathaway*, 37 F.3d at 66 (quoting *Wilson v. Seiter*, 501 U.S. 294,

298 (1991)).   "Because society does not expect or intend prison conditions to be

comfortable, only extreme deprivations are sufficient to sustain a

'conditions-of-confinement' claim."   *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999)

(citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992)).

 The subjective element of the Eighth Amendment analysis focuses on whether the

---

[4]   In *Benjamin v. Fraser*, 343 F.3d 35, 51 (2d Cir. 2003), the Second Circuit held that "in a challenge by pretrial detainees asserting a *protracted* failure to provide safe prison conditions, the deliberate indifference standard does not require the detainees to show anything more than actual or imminent substantial harm."   (Emphasis in original).   *Benjamin* involved a series of consent decrees resulting from seven class actions, each brought by pretrial detainees challenging the conditions of confinement at fourteen jails in New York City.   343 F.3d at 39.   Here, Silber's dry cell allegations involved a single incident, with a single detainee, lasting no more than five days.   Because Silber's claims did not involve "protracted" and ongoing harm, the Court should apply the Eighth Amendment standard to his allegation that dry cell confinement constituted a "serious threat to [his] health or safety."   *Caiozzo*, 581 F.3d at 72.

defendant official acted with "a sufficiently culpable state of mind."   *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson*, 501 U.S. at 300).   "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm.   *Farmer*, 511 U.S. at 835.   In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety.   *Hathaway*, 37 F.3d at 66.   The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.   *Id.*

Silber claims that while in the dry cell, he was stripped of all clothing except a pair of boxer shorts and "left in a freezing cold cell with an open window [in] December.   For 5 days he was not permitted a shower, nor soap, shampoo, towel, toilet paper, toothbrush, toothpaste or other basic human needs."   (Doc. 58 at 6.)   He also alleges that when he complained about the cold, he was told to "toughen up" and that "something would be done to remedy the open window, but nothing ever was."   (*Id.* at 7)

The Second Circuit has held that "deliberate exposure of inmates by prison authorities to bitter cold while in solitary confinement would be evidence of cruel and unusual punishment."   *Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988); *see Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (holding that summary judgment for defendants was precluded where prisoner was subjected to temperatures near or well below freezing in his cell for a five-month period); *Wright v. McMann*, 387 F.2d 519, 526 (2d Cir. 1967) (vacating dismissal on the pleadings where complaint alleged that prisoner was twice deliberately exposed to bitter cold for periods of twenty-one days or more in filthy

18

and unsanitary cell).   The duration of that exposure appears to be significant.   In *Gaston*,
the Second Circuit specifically noted that "prolonged" periods of exposure may yield an
Eighth Amendment violation.   249 F.3d at 164.   Relief has been denied where such
exposure was not "prolonged."   *See, e.g., Borges v. McGinnis,* 2007 WL 1232227, at *4-6
(W.D.N.Y. Apr. 26, 2007) (keeping inmate, clothed only in paper gown and slippers, with
a thin mattress and no blanket, in a room with an open window that reduced the
temperature to approximately 50 degrees for three days did not meet the objective element
of an Eighth Amendment violation); *Smith v. Burge,* 2006 WL 280524,2 at *7 (N.D.N.Y.
Sept. 28, 2006) (confinement of inmate, for less than one day, in a T-shirt and underwear,
in a cell with an open window, exposing him to "cold" or "very cold" temperatures, was
not sufficiently prolonged or severe to rise to the level of an Eighth Amendment violation).

With respect to the duration of the alleged constitutional violation, the facts of this
case are not as extreme as those found in controlling case law.   For example, in *Corselli*,
the inmate claimed that he was exposed to bitterly cold temperatures for approximately
three months, and that corrections officials had deliberately torn down the plastic sheeting
covering otherwise-open windows.   842 F.3d at 27.   Similarly, in *Gaston*, the inmate
complained that the windows in his cell block were broken and that "despite numerous
complaints, [they] remained unrepaired for the entire winter, exposing inmates to freezing
and sub-zero temperatures."   249 F.3d at 165.   And in *Wright*, the inmate was exposed to
"cold air and winter weather" for periods ranging from twenty-one to thirty-three days.
387 F.2d at 522; *see also Trammel v. Keane,* 338 F.3d 155, 164-65 (2d Cir. 2003).

The facts presented here are far closer to those found in *Borges*, in which the U.S.

District Court for the Western District of New York granted summary judgment to the

defendants.   2007 WL 1232227, at *6.   The *Borges* court found as follows:

> In this case, plaintiff was kept in an observation cell for three days, because
> corrections staff were attempting to recover contraband which plaintiff had
> ingested during a visit with his mother.   Defendants' suspicions in this
> regard were well-founded, and they eventually recovered a quantity of
> marijuana inside a balloon, which apparently plaintiff had swallowed.
> Although plaintiff was not given a blanket, he was given a paper gown, paper
> slippers, and a thin mattress.   In this regard, plaintiff was treated in the same
> manner as inmates on suicide watch.   As to the mattress, the Court notes that
> it was a thin mattress pad that plaintiff actually used as both a shawl and a
> blanket.   Plaintiff spent much of his time lying on the bed, covered with the
> "mattress," and apparently asleep.   For reasons that no one has explained, a
> window in the cell was open, and the cell temperature was around 50
> degrees, which undoubtedly and unfortunately made plaintiff uncomfortable.
> Plaintiff was provided with meals, personal hygiene items, and medical
> attention.   Moreover, it is undisputed that plaintiff would have been
> provided with a blanket on November 26th if he had not violated facility
> rules by covering the security camera.
>
> Overall, plaintiff does not allege that he suffered anything more than
> frustration and discomfort as a consequence of the coldness of his cell.
> Thus, his claim does not rise to the level of a condition of confinement that
> violates the Eighth Amendment.

*Id.*   Here, Silber's detention was somewhat longer than that alleged in *Borges*, but did not

approach the "prolonged" periods identified in Second Circuit case law.

As to the deprivation of basic toiletries, courts have similarly held that temporary

deprivations do not violate the Eighth Amendment.   *See Trammell*, 338 F.3d 155, 165 (2d

Cir. 2003) ("[d]eprivation of other toiletries [aside from toilet paper] for approximately

two weeks — while perhaps uncomfortable — does not pose such an obvious risk to an

inmate's health or safety to suggest that the defendants were "aware of facts from which

the inference could be drawn that a substantial risk of serious harm exist[ed], and [that they

also drew] the inference.")[5]; *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988)

(denial of soap, toothpaste and toothbrush for ten days, and toilet paper for five days, did

not violate the Eighth Amendment); *Jackson v. DeTella*, 998 F. Supp. 901, 905 (N.D. Ill.

1998) (eight-day deprivation of hygiene items and bedding did not violate prisoner's

constitutional rights); *Gilland v. Owens*, 718 F. Supp. 665, 685 (W.D.Tenn. 1989) ("[s]hort

term deprivations of toilet paper, towels, sheets, blankets, . . . toothpaste, toothbrushes, and

the like do not rise to the level of a constitutional violation.").   Nor does a five-day period

without a shower constitute cruel and unusual punishment under the Eighth Amendment.

*See, e.g., McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) ("a two-week

suspension of shower privileges does not suffice as a denial of 'basic hygienic needs'")

(citation omitted); *Roberts v. Snyder*, 2001 WL 655436, at *5 (D. Del. March 27, 2001)

(holding denial of opportunity to shower for five days "did not deprive plaintiff of

'minimal civilized measure of life's necessities.'") (citation omitted).

Given that Silber's allegations set forth temporary deprivations, it is questionable

whether any Defendant violated his clearly established rights under the Eighth

Amendment, at least with respect to the objective element of the standard.   Even assuming

such a deprivation, however, Silber's claims fail under the subjective prong, as his dry cell

allegation fails to establish that any Defendant acted with "a sufficiently culpable state of

---

[5]   While there is authority in this circuit for the proposition that a denial of toilet paper in a strip cell violates constitutional standards, s*ee Wright*, 387 F.2d at 526 (conditions of confinement in strip cell including denial of toilet paper for 33 days violated Eighth Amendment), the instant case is again distinguishable, as the length of the deprivation was far less severe.   *See Smith v. Copeland*, 87 F.3d 265, 269 (8th Cir. 1996) ("[T]he length of time a prisoner is subjected to harsh conditions is a critical factor in [an Eighth Amendment] analysis.   Conditions such as a filthy cell that may be tolerable for a few days are intolerably cruel for weeks or months." (citations omitted).

mind." *Salahuddin*, 467 F.3d at 280.   Indeed, it is not clear from his filings that any of the Defendants had even minimal involvement in the dry cell episode.

Eleven Defendants have been named in this case.   (Doc. 58 at 2-3.)   Most are supervisors, and are alleged to have had either a role in the development of a close custody detention policy, or notice of Silber's close custody classification.   The only Defendant alleged to have had any connection to dry cell confinement is Living Unit Supervisor James Kamel, for whom Silber's entire claim reads: "'Dry-Cell' policies and practices." (Doc. 58 at 3.)

Specifically, there is no claim that any Defendant declined to close an open window, deprived Silber of personal hygiene items or blankets, or made any allegedly-derisive comments.   (*Id.*)   Nor does Silber claim that he complained to DOC supervisors about his treatment.   Even the claim against Defendant Kamel is too vague to establish either direct or supervisory liability.   *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) (stating that "bald assertion[s], completely unsupported by evidence" cannot defeat summary judgment); *see also Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986) ("plaintiff must allege a tangible connection between the acts of a defendant and the injuries suffered"); *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) ("supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior*").   The named Defendants are therefore entitled to summary judgment with respect to this claim.   *See, e.g.*, *Kopy v. Howard*, 2010 WL 3808677, at *4 (N.D.N.Y. Aug. 11, 2010) (granting summary judgment to defendants on allegations of placement in "'cold air-conditioned cell stripped out in the winter with no [mattress],

22

bedding, blanket or clothing, [hygiene] products and also no toilet paper at all,'" finding

that allegations were "conclusory" and "fail[ed] to allege any personal involvement on the

part of any named Defendant").

Finally, even assuming Defendants' personal involvement on a supervisory level,

Silber has not established that the DOC's policy or practice of using dry cells violated any

constitutional right.   As the Second Circuit noted in *Trammel*, "we consider whether the

[policy] was reasonably calculated to restore prison discipline and security and, in that

purposive context, whether the officials were deliberately indifferent to [plaintiff's] health

and safety."   328 F.3d at 163.   It appears from the Amended Complaint that dry cell

confinement was designed to reveal whatever contraband Silber had allegedly concealed.

Because he could have chosen to reveal the contraband, Silber "held the keys to his own

cell door, figuratively speaking, and could have rid himself of the harshest aspects of the

[policy] . . . ."   *Id.* at 164.   Presumably pursuant to the dry cell policy, Silber was placed

on fifteen minute checks to monitor his status, and his confinement was reviewed every

eight hours.   There is no suggestion in the Amended Complaint that open windows were a

part of the standard procedure.   Indeed, as Joshua Rutherford states in his affidavit, cells

are generally kept at between 68 and 72 degrees Fahrenheit through the winter, and exterior

windows are closed during that time.   (Doc. 48-3 at 2.)   Consequently, Silber has failed to

raise any genuine issues of fact regarding Defendants' liability for his dry cell

confinement, and the Court should grant their motion for summary judgment on this claim.

**V.     Retaliation Claim**

Defendants' final argument is that Silber's retaliation claims are unfounded.   As

23

discussed above, Silber asserts in conclusory fashion that his placement in a dry cell was "pure retaliatory harassment . . . ."  (Doc. 58 at 7.)   He does not identify the reason for such retaliation, or any other facts to support his claim.

Assuming that Silber is claiming that was retaliated against for exercising some form of First Amendment right, he must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."   *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citation omitted).   To show causation, a plaintiff's "allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action."   *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003) (citation omitted).   Since it is "near[ly] inevitabl[e]" that "prisoners will take exception" with the decisions of prison officials, the Second Circuit has cautioned that prisoners' retaliation claims must be "examin[ed] . . . with skepticism and particular care."   *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *see also Davis*, 320 F.3d at 352.

The facts in this case do not support a retaliation claim.   The uncontroverted evidence at summary judgment is that Silber was seen trying to conceal contraband. When restrained, he gave resistance, and even after being handcuffed he allegedly continued his efforts at concealment.   Once in the dry cell, he was observed putting an object in his mouth.

As to the elements of his retaliation claim, Silber has not specified any protected conduct or speech, and has not offered evidence to support an inference that such conduct or speech played a role in his confinement.   Indeed, the evidence at summary judgment

indicates that, to the contrary, it was his perceived attempts to conceal contraband that resulted in his placement in a dry cell.   I therefore recommend that Defendants' motion for summary judgment on Silber's retaliation claim be GRANTED.

## Conclusion

For the reasons set forth above, I recommend Defendants' Motion for Summary Judgment (Doc. 48) be GRANTED and that this case be DISMISSED.

Dated at Burlington, in the District of Vermont, this 7th day of February, 2011.


/s/ John M. Conroy_____
John M. Conroy
United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c).   Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.   *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).